**STATE of Missouri,
Plaintiff–Respondent,**

v.

**Chris BLACKMON, a/k/a Crystal
Blackmon, Defendant–Appellant.**

**No. 14819.**

Missouri Court of Appeals,
Southern District, Division Two.

Jan. 12, 1988.

William L. Webster, Atty. Gen., Deborah L. Ground, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Kathleen Murphy Markie, Columbia, for defendant-appellant.

HOGAN, Judge.

In this case, an all-white jury convicted Chris Blackmon, a black male, of selling marihuana in violation of § 195.020, RSMo Cum.Supp.1984. His punishment was assessed at imprisonment for a term of five (5) years, and he appealed. When the appeal was first submitted to this Court in April 1987, both the State and the defendant urged the Court to remand the cause for a hearing to determine whether the State's exercise of its peremptory challenges violated the principles laid down in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

At that time, we had before us the opinion in *Griffith v. Kentucky*, 479 U.S. ——, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), which held that *Batson* applied to criminal prosecutions pending on direct review or not yet final when *Batson* was decided. *Griffith*, 479 U.S. at ——, 107 S.Ct. at 710. We also had before us an order dated February 17, 1987 in *State v. Antwine*, No. 67720, wherein our Supreme Court afforded some guidelines by which to determine whether the jury composition issue addressed in *Batson* and *Griffith* had been properly preserved for review. We concluded that the defendant's objection during the trial was marginally sufficient to raise the question whether the State had exercised its peremptory challenges to exclude qualified black veniremen, thereby infringing defendant's Fourteenth and Sixth Amend-

ment rights to equal protection. We therefore remanded the cause to the trial court, ordering that court to determine: 1) whether the defendant had established a prima facie case of purposeful discrimination against qualified black veniremen, and 2) whether the State had a neutral explanation for its use of peremptory challenges to strike black veniremen from the panel. The trial court held an evidentiary hearing. It concluded that the State's challenge to venireman J.C. Armour, a black man, was neither "neutral" nor "legitimate" within the meaning of *Batson*, 106 S.Ct. at 1723. The trial court's findings of fact and conclusions of law have been filed here, and we now have the benefit of our Supreme Court's opinion on the merits in *State v. Antwine*, 743 S.W.2d 51 (Mo.banc 1987).

## I

In *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759, the United States Supreme Court recognized that a State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause. Id., 380 U.S. at 203–204, 85 S.Ct. at 826. In *Batson*, the court further held that a defendant in a state criminal trial could establish a prima facie case of racial discrimination violative of the Fourteenth Amendment based on the prosecution's use of peremptory challenges to strike members of the defendant's race from the jury venire, and that, once the defendant had made a prima facie showing, the burden shifted to the prosecution to come forward with a neutral explanation for those challenges. *Griffith v. Kentucky*, 479 U.S. ——, ——, 107 S.Ct. 708, 710, 93 L.Ed.2d 649 (1987). As noted, *Griffith* also applied *Batson* to criminal prosecutions pending on direct review or not final when *Batson* was decided. *Griffith*, 479 U.S. at ——, 107 S.Ct. at 710. *Batson* therefore controls here.

As our Supreme Court held in *Antwine*, 743 S.W.2d 63, *Batson* suggests that it should be read side-by-side with the United States Supreme Court's Title VII cases. In interpreting *Batson* for our guidance, our Supreme Court held:

"The ultimate burden of persuasion lies with and never shifts from the defendant ... A defendant may 'rely on the fact ... that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate".' ... and may establish a prima facie case of discrimination by showing that (1) defendant is a member of a cognizable racial group, (2) that the prosecutor has exercised peremptory challenges to remove members of the defendant's race from the venire, and (3) that 'these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.' ...

Defendant's establishment of a prima facie case creates a rebuttable presumption that the prosecutor exercised his peremptory challenges in a discriminatory manner. ... The burden ... then shifts to the State to rebut the presumption ... with a neutral explanation for challenging black jurors. ... The proffered neutral explanation 'must give a "clear and reasonably specific" explanation of the State's "legitimate reason" for exercising the challenges.' ...

If the State comes forth with a neutral explanation, 'the presumption raised by the prima facie case is rebutted ... and the factual inquiry proceeds to a new level of specificity.' ... Defendant now has the obligation to demonstrate that the State's explanations are merely pretextual and, thus, not the true reason for the use of the State's peremptory challenges.

As a practical matter, the third element of the prima facie case under *Batson*—'facts and any other relevant circumstances [which] raise an inference that the prosecutor used [his peremptory challenges] to exclude the veniremen from the petit jury on account of their race'—requires the trial court to consider the State's explanation of the manner in which it employed its challenges prior to making a final determination as to whether a prima facie case exists. We

must therefore direct our trial judges to consider the prosecutor's explanations as part of the process of determining whether a defendant has established a prima facie case of racially discriminatory use of peremptory challenges." [Citations omitted]

*Antwine,* 743 S.W.2d at 63–64.

The court then went on to consider the opinion of our colleagues at Kansas City in *State v. Butler,* 731 S.W.2d 265 (Mo.App. 1987). In general, our Supreme Court agreed with the Western District's analysis of the trial court's obligation to assess the "neutrality" of the explanations offered by the prosecutor. However, the *Antwine* court qualified its agreement with the *Butler* opinion, stating:

"... And we believe that *Batson* leaves room for the State to exercise its peremptory challenges on the basis of the prosecutor's legitimate 'hunches' and past experience, so long as racial discrimination is not the motive. We do not, therefore, adopt the holding of *Butler* that only objectively supportable explanations for its use of peremptory challenges survive a *Batson* challenge." [Citations omitted]

*Antwine,* 743 S.W.2d 65.

The court was at pains to emphasize the subjective nature of discriminatory purpose in the jury selection process. *Batson,* it held, recognizes the subjective nature of peremptory challenges and permits their continued use. Nevertheless,

"... *Batson* strictly prohibits the use of peremptory challenges in a racially discriminatory manner. Therefore, we read *Batson* to require the trial judge to assess the entire milieu of the voir dire objectively and subjectively. The judge must consider his personal, lifetime experiences with voir dire, comparing his observations and assessments of veniremen with those explained by the State. In addition, he must consider both his personal experiences with the prosecutor and any evidence offered by a defendant to show a pattern or practice of a prosecutor using peremptory challenges in a racially discriminatory manner over the course of time. Other factors must be considered as circumstances demand.

Ultimately, however, the trial judge must focus all of the information and intuitive perceptions he has gathered to determine whether the prosecutor's use of his peremptory challenges proceeds from a racially discriminatory motive. We thus place great responsibility in our trial judges, confident that they, 'experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.' " [Citation omitted]

*Antwine,* 743 S.W.2d at 65–66.

The court also furnished guidance for the purpose of reviewing a trial court's findings on *Batson* issues. It held:

"A finding of discrimination, or a finding of no discrimination, is a finding of fact. ... In a *Batson* context, the [United States] Supreme Court observed that because the trial judge's findings 'largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.' ... '[F]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.' ...

'[A] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' ... Thus, if the trial court's 'account of the evidence is plausible in light of the record viewed in its entirety, [an appellate] court may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.' ..." [Citations omitted]

*Antwine,* 743 S.W.2d 66.

## II

In the case at hand, a panel of 25 jurors was summoned, as provided by § 494.065, RSMo Cum.Supp. 1984 and § 546.210,

RSMo 1978. Four members of the panel, J.C. Armour, Willie Lorene Reed, Rex Wayne Rattler and Janice Ruth Ellison were black men and women. Upon voir dire examination, both Mr. Rattler and Ms. Ellison indicated they might have difficulty being impartial because they knew the defendant's family. Rattler and Ellison were excused for cause by the court.

■ Removal of the other two black veniremen from the jury list presents a different question. The trial court found that when the Prosecuting Attorney received the jury list, it bore 23 names. Only one person on the list knew the Blackmon family. In response to questions on voir dire, Mrs. Willie Lorene Reed had advised the State that she knew the defendant's father, but did not believe that acquaintance would affect her duty to sit as a fair and impartial juror in the case. However, upon interrogation, Mrs. Reed qualified her assertion of impartiality thus:

> "MR. CRAWFORD: Could you set that aside and judge his guilt or innocence based on the instructions and evidence presented at the trial?
>
> VENIREMAN REED: Maybe.
>
> MR. CRAWFORD: Excuse me?
>
> VENIREMAN REED: Maybe.
>
> MR. CRAWFORD: You don't know whether you could or not?
>
> VENIREMAN REED: I really don't know."

. . . .

Mrs. Reed was peremptorily stricken from the jury list by the Prosecuting Attorney. At the evidentiary hearing, Mr. Crawford—who had been the prosecutor—was asked about his peremptory challenge to Mrs. Reed, as follows:

. . . .

> "Q. Did it [the peremptory challenge to Mrs. Reed] have anything to do with the fact that she was a black woman?
>
> A. Did it have anything to do with the fact that she was a black woman? No. It had something to do with the fact she knew either the defendant or his family. She indicated that in response to the question during voir dire. As I remember from reading the transcript at first

she indicated she might have some difficulty returning a verdict of guilty and then I think later on during the questioning by the court—
>
> Q. She recanted that?
>
> A. She indicated she thought she could do her job and be a fair and impartial juror.. But I certainly wasn't willing to take a chance on behalf of the state that she might get back there and hang them up and not be able to find the defendant guilty. . . ."

We have restated the voir dire at length precisely to show that Mrs. Reed was very reluctant to say, unequivocally, that she could act fairly and impartially as a juror. The foundation of our system is that a cause should be tried by individuals who are free from partiality or bias for or against the litigants. *State v. Richards,* 536 S.W.2d 779, 785[1] (Mo.App.1976). The prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723; *Antwine,* 743 S.W.2d at 65. The trial court found that the prosecutor's explanation of his challenge to Mrs. Reed was clear, reasonably specific, and legitimate. We agree, and hold that as to Mrs. Reed, defendant's prima facie case was rebutted.

What then, of venireman Armour? We have carefully examined the record for information concerning J.C. Armour. The record permits the inference that one or more of the black veniremen or their relatives lived in a wholly black community called the Morocco Providence. This black community is near Poplar Bluff. The trial court participated in the voir dire. The questions put by the court were intended, among other things, to disclose any venireman's acquaintance with the defendant's family. Several veniremen indicated they knew the defendant's family but venireman Armour made no response to any of the questions asked on voir dire. There is no record indication that Armour lived in the black community referred to as the Morocco Providence, or that he knew the defendant or his family.

At the evidentiary hearing, Mr. Crawford was asked about his reason for striking Mr. Armour. He answered:

"A. Again, I have had to piece this together from reading the record. I don't have any independent recollection of what was going through my mind at that time. When I was exercising my peremptory challenges I knew at that time —I had to have known it from my reading the record, that three of the four blacks on the jury panel, uhh [sic], knew either the defendant and/or his family. I'm not sure if they knew him and his family or one or the other, but anyway, they knew him. And like I said, they not only knew him but thought well of him, indicating they could not return a verdict of guilty. And I'm sure I must have thought at that time that his family was well known in the black community.

Uhh, [sic] I was raised in Southeast Missouri. I came from Sikeston and it's been my knowledge that most towns in Southeast Missouri do have black communities. Poplar Bluff, Sikeston, Kennett or whatever do have particular areas of town where most of the blacks live. That's just the way demographics are in Southeast Missouri. Mr. Armour, from reading the transcript I can ascertain that he did not make any statements whatsoever during the voir dire. Now, I'm sure that I must have had a concern that, uhh, [sic] perhaps he, uhh, [sic] either knew of Mr. Blackmon or his family and was not saying anything or possibly he did not remember. I can see from reading jury questionnaires that he was a man sixty years old or somewhere around there and I was again concerned that he would not only know Mr. Blackmon or his family, but again be partial towards Mr. Blackmon based upon Mr. Blackmon's good family reputation in the black community. I believe out of— since there wasn't anybody better to strike that I went ahead and struck Mr. Armour off the jury."

The trial court found that this explanation did not satisfy the requirements of *Batson,* and we agree. The trial court's finding was that:

"[Crawford's] explanation as to venireman Armour boils down to this—'I did not strike Armour because he was Black. I struck him because he was a member of the Black Community.'"

We must agree. What the *Batson* application of the equal protection clause forbids is a peremptory challenge to a potential juror solely on account of his race *or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.* *Batson,* 476 U.S. at 89, 106 S.Ct. at 1719. With deference, Crawford's explanation was little more than an expanded statement that he acted on the assumption that Armour, as a black juror, would be unable to consider the State's case impartially.

### III

To put our conclusions in a more orderly perspective, we note that the trial court found as a matter of fact that the defendant made a prima facie case. We have not to this point addressed that finding, but the record circumstances certainly support it. Establishing a prima facie case required a showing: 1) that defendant was a member of a cognizable racial group; 2) that the prosecutor exercised peremptory challenges to remove members of the defendant's race from the venire, and 3) that these facts and other relevant circumstances raised an inference that the prosecutor used his peremptory challenges to exclude veniremen from the petit jury on account of their race. *Antwine,* 743 S.W.2d at 64.

There is no question that Blackmon is a member of a cognizable racial group; he is black. The record presented shows that the State used its peremptory challenges to remove half the black veniremen from the panel which was summoned. Were there then facts and circumstances from which one might infer purposeful discrimination? We conclude there were at least two circumstances which permit such an inference. After veniremen Rattler and Ellison were excluded by the court for cause, 23 names remained on the jury list. Each

party was entitled to six peremptory challenges by the provisions of § 546.180.1(2), RSMo Cum.Supp.1983. One of the remaining veniremen inadvertently disqualified himself. The trial court advised the parties that if one peremptory challenge were not waived, it would be necessary to summon talesmen. The State waived a peremptory challenge. We may therefore infer that the State exercised its remaining peremptory challenges purposefully. Further, as the trial court noted, the State's explanation specifically established that it proceeded on an assumption forbidden by *Batson.* The defendant made a prima facie case, and as we have already seen, the State's explanation was insufficient to rebut that prima facie case.

For the reasons noted and discussed, the conviction is vacated and the cause is remanded for a new trial. It is so ordered.

PREWITT, P.J., and FLANIGAN, and MAUS, JJ., concur.